UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRST PLACE BANK

    Plaintiff,

vs
                                        Case No:  11-13542
                                        Honorable Victoria A. Roberts

OLYMPIA LOGISTICS & SERVICES., INC.
GRIES JEWELERS, INC.,

        Interpleader-Defendants,

and

OLYMPIA LOGISTICS & SERVICES, INC.,

        Interpleader-Defendant/Cross-Plaintiff,

vs

GREIS JEWELERS, INC.,

        Interpleader-Defendant/Cross Defendant.

_____/

**OPINION AND ORDER**

**I.  INTRODUCTION**

      First Place Bank settled its interpleader action against one defendant, Greis Jewelers, Inc. First Place now stands in Greis's shoes to assert claims Greis has against co-defendant Olympia Logistics & Services, Inc. First Place claims it is entitled to $47,000.00 which was wired to its bank account by Olympia in a fraud perpetrated by Jay Ritz who is nowhere to be found. Ritz arranged to purchase watches online from Greis. The price of $47,000.00 was agreed upon, and Ritz got Greis's account number to wire funds. Ritz had no intention of wiring his own funds to pay for the watches. Instead, he intended to sell a car which he did not own —online— to

1

Olympia, for $47,000.00, and get Olympia to wire its $47,000 to Greis's account. The fraud was uncovered, but not before Ritz made off with Greis's watches, Olympia was out both $47,000.00 and the car, and Greis was out of the watches with First Place holding the $47,000.00.

Oral argument was held on March 18, 2013. For the reasons stated, Greis is entitled to the wire transfer funds, and Olympia is estopped from any equitable arguments for restitution. First Place's motions are **GRANTED**; Olympia's motion is **DENIED.**

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. The Underlying Transactions

The pertinent facts in this case are undisputed. Greis and Olympia were victims of fraud perpetrated by a third-party— Jay Ritz. In July 2011, Ritz conjured a scheme to gain valuable property from Greis at Olympia's expense.

Greis is a jewelry store located in Farmington Hills, Michigan. Greis does business in its store as well as over the internet. Beginning in July 2011, Greis posted a rare Audemars Piguet watch for online sale at a price of $41,000.00. Greis did not own the watch, but was selling it on consignment for another party. On July 27, 2011, Ritz contacted Greis about buying the watch. According to Greis, it is normal practice for online customers to contact the store directly to finalize a sale. In addition to the Audemars Piguet, Ritz also wanted to purchase a ladies' watch. Greis did not have the ladies' watch in stock, but Ritz agreed that Greis would purchase the parts and assemble it in-house for a reduced price. In all, the two watches cost $47,000.00.

Ritz and Greis agreed to a wire transfer. On July 28, 2011, after exchanging e-mails, Greis provided Ritz with wiring information to its bank account at First Place. Greis instructed that the funds were to be transferred to its First Place account, held in the name "Greis Jewelers, Inc.," account number ending in 7140.

2

At the same time Ritz negotiated with Greis, he was negotiating a transaction with Olympia. Olympia is an export business based in Miami, Florida. In July 2011, Hakan Sayin, Olympia's owner, found a 2009 BMW X6 for sale online. Sayin called the listed seller, Motor Tran, and spoke with its owner — Jason Ritz, also known as "Jay" Ritz. Sayin asked his friend, Levent Bozkurt, to help him negotiate the purchase of the BMW. After exchanging emails in July 2011, Sayin, Bozkurt, and Ritz negotiated the sale of the car, which, according to Ritz, was located outside Portland, Oregon. Eventually, Ritz and Sayin settled on a purchase price of $47,000.00. They agreed on a wire transfer payment.

### B.  The Transfer Date

Both transactions were set to take place on July 29, 2011. After Greis provided Ritz with Greis' wiring information for its First Place account, Ritz gave that information to Olympia, representing that it was his personal account. On July 29th, Ritz emailed Olympia his wiring information — the Greis account ending in 7140. Ritz also told Olympia to earmark the recipient as "Greis JEW, Inc." Later that day, Olympia instructed its bank, Regions Bank, to wire $47,000.00 to "Greis JEW, Inc," account ending in 7140, located at First Place. Sayin's wife, an authorized signer of Olympia's accounts, signed the Wire Transfer/Request Authorization form at Regions.

As Olympia was in the process of wiring the funds, Ritz and Greis exchanged emails about shipping the watches after the funds were received. Ritz informed Greis that the wire transfer was sent and Greis verified the transaction with First Place.

According to Jaime Lowther, Manager of Electronic Banking at First Place's Warren, Ohio branch, wire transfers sent to First Place use the Fedwire funds transfer system. It works like this. Incoming wire transfers sent to First Place are processed through the FedLine

3

Advantage Program. When the wire is received, an electronic message confirms the transfer. A First Place "Processing Employee" prints the message and saves it to a file. The Processing Employee then reviews the beneficiary's bank account to confirm that the bank account and the wire transfer beneficiary are the same person or entity. Only if there is a complete disconnect between the name and the account number, does First Place returns the wire transfer.

Lowther says Greis's account was credited because "Greis JEW, Inc," was an abbreviation of the listed account holder "Greis Jewelers, Inc." This was consistent with First Place's internal policies.

Later on July 29th, Greis received verification over the phone that the funds were received and its account was credited. Greis emailed Ritz confirming that it received the money. Greis verified the shipping address and shipped the Audemars Piguet to Ritz.

The same day, Greis paid the consignor $35,000.00 for the Audemars Piguet. Greis also paid a vendor $3,000.00 for the parts to assemble Ritz's ladies' watch, and used some of its own inventory. Overall, Greis spent roughly $5,000.00 assembling the ladies' watch. On August 3, 2011, Greis shipped the ladies' watch to Ritz.

### C.  Discovering the Fraud

Between July 30 and August 3, 2011, Olympia tried to arrange to get the car from Ritz. On August 3rd, Ritz gave Olympia a location. However, when Olympia's trucking company went to the place, neither Ritz, nor the BMW was there. Sayin never heard from Ritz again.

On August 4, 2011, Sayin, after realizing that Ritz had defrauded him, obtained a CARFAX report using the VIN-number for the BMW provided by Ritz. The report disclosed that neither Ritz, nor Motor Tran was the registered owners of the car; it was actually registered

4

2:11-cv-13542-VAR-RSW   Doc # 49   Filed 03/18/13   Pg 5 of 17   Pg ID 471

to another party located in Colorado. Sayin contacted Regions and asked that it rescind the wire transfer. Regions made that request to First Place.

First Place began an internal investigation, placed a temporary hold on Greis's account, and contacted Greis about its transaction with Olympia. When First Place realized that both Greis and Olympia claimed ownership of the $47,000.00, it initiated this interpleader action.

### D.  Procedural History

Greis filed a counter-claim against First Place alleging conversion of the disputed funds. Additionally, Olympia filed an unjust enrichment cross-claim against Greis seeking restitution.

First Place and Greis settled Greis's counter-claim and it was dismissed. Under the settlement, Greis assigned all of its rights, title, and interest in the disputed funds to First Place — as well as any claims or defenses. By virtue of this assignment, whatever rights or liabilities Greis incurs regarding the disputed funds and Olympia's cross-claim, become First Place's.

In its motion for summary judgment, First Place says that no genuine issues of fact exist regarding its entitlement to the wired funds and that Olympia has no claim to the funds in either law or equity. Olympia claims interest in the same funds and also moves for summary judgment on its cross-claim.

The Court first addresses jurisdiction and the juxtaposition of the parties since suit was filed.

## III. ANALYSIS

### A.  Interpleader's Process and Purpose

An interpleader action "is an equitable proceeding" which allows a party to avoid being exposed to multiple liabilities on a single fund or piece of property in his or her possession by

5

"'settl[ing] the controversy and satisfy[ing] his obligation in a single proceeding.'" *U.S. v. High Technology Products, Inc.,* 497 F.3d 637, 641 (6th Cir. 2007) (quoting Charles Alan Wright, et. al., *When Interpleader is Appropriate—In General,* 7 Fed. Prac. & Proc. Civ. § 1704 (3d ed. 2001)). Generally, interpleader proceeds in two stages: First, "the court determines whether" the plaintiff, also known as the "stakeholder[,] has properly invoked interpleader, including whether the court has jurisdiction over the suit, whether the stakeholder is actually threatened with double or multiple liability, and whether any equitable concerns prevent the use of interpleader;" second, "the court determines the respective rights of the claimants to the fund or property at stake via normal litigation processes, including pleading, discovery, motions, and trial." *Id.* (citing Wright et. al., at § 1714).

### *i. The Court Has Jurisdiction Over The Interpleader Action*

"Interpleader may be invoked in the federal courts via [FRCP] Rule 22 or via the Interpleader Act, 28 U.S.C. § 1335." *Id.* at 641 n. 1. Under the Interpleader Act, commonly known as "statutory interpleader," a court has jurisdiction if three statutory prerequisites are established: (1) The plaintiff, or stakeholder, must have "in his or its custody or possession money or property" valued at $500.00 or more. 28 U.S.C. § 1335(a) (West 2012); (2) there must be "[t]wo or more adverse claimants, of diverse citizenship" claiming title to the money or property. *Id.* § 1335(a)(1); and (3) the plaintiff must have "deposited such money or property[,]" or a bond of equivalent value, into the Court's registry. *Id.*

Moreover, the adequacy of these prerequisites, and, therefore, "the existence of subject matter jurisdiction[,] is determined as of the date the action is brought" and "remains notwithstanding" later changes to the status of the parties. *Lincoln Gen. Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 425 F. Supp. 2d 738, 742 (E.D. Va. 2006).

The value of the disputed property is $47,000.00. Greis is a corporation domiciled in Michigan, and Olympia is a corporation domiciled in Florida. First Place was threatened by the possibility of multiple liabilities over the disputed $47,000.00 by both Greis and Olympia. Subject matter jurisdiction was established when the interpleader was filed; the assignment agreement between First Place and Greis does not change that.

The Court now examines whether there is a genuine dispute concerning entitlement to the $47,000.00.

### B.  Standard of Review

 "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 389 (6th Cir. 2008) (quoting Fed. R. Civ. P. 56(c) (West 2012)). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 248 (1986)). "The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Anderson,* 477 US at 251-52).

"The moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *White,* 533 F.3d at 389-90 (citing *Celotex Corp. v. Catrett,* 477 US 317, 323 (1986)). If the moving party carries this burden, the burden then shifts and the non-moving party "may not rest upon its mere allegations or denials of

the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009).

### C.  Under the UCC, First Place Has Title To The Disputed Funds

The "[r]ights and liabilities for payment orders, or wire transfers," fall under Article 4A of the Uniform Commercial Code ("UCC"). *First Sec. Bank of N.M. v. Pan American Bank,* 215 F.3d 1147, 1152 (10th Cir. 2000). "Article 4A was crafted with the express purpose of creating — in an age of increasing automation — inflexible rules of liability for wire transfer disputes." *Id.* But, in statutory interpleader cases, "in which jurisdiction is founded on the diversity of the parties' citizenship," the court applies the "rules of the forum state." *Republican Nat. Committee v. Taylor,* 299 F.3d 887, 890 (D.C. Cir. 2002) (citing *Klaxon Co. v. Stentor Elc. Mfg. Co.,* 313 US 487, 496 (1941)). In Michigan, Article 4A of the UCC is codified under Mich. Comp. Laws § 440.4601 *et. seq.*

Given the UCC's complexity in wire transfer cases, it is important to clarify who the immediate parties are under Article 4A.

### i. The Parties Under Article 4A of the UCC

Under Michigan's codification of the UCC, a "payment order" is "an instruction of a sender to  a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary . . . ." M.C.L. § 440.4603(a) (West 2012). A "beneficiary" is "the person to be paid by the beneficiary's bank." *Id.* § 4603(b). The "beneficiary bank" is "the bank identified in a payment order in which an account of the beneficiary is to be credited" according to the payment order. *Id.* § 4603(c). A "receiving bank" is "the bank to which the sender's instruction is addressed." *Id.* § 4603(d). And, a "sender" is "the person giving the instruction to the receiving bank." *Id.* § 4603(d).

8

Additionally, a "funds transfer" is "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." *Id.* § 4604(a). "The term includes any payment order issued by the originator's bank . . . intended to carry out the originator's payment order." *Id.* The "originator" is "the sender of the first payment order in a funds transfer." *Id.* § 4604(c). Finally, because the originator here is not a bank, the "originator's bank" is "the receiving bank to which the payment order of the originator is issued . . . ." *Id.* § 4604(d)(i).

Under Article 4A, Olympia is the sender and originator; Greis is the beneficiary; Regions Bank is the receiving bank and the originator's bank; First Place is the beneficiary bank (Greis's bank); and, the wire transfer is both the payment order and the funds transfer.

### *ii. First Place Accepted the Wire Transfer Entitling Greis to the Funds Transfer*

"Acceptance within the meaning of Article 4A is the key[]" to entitlement to disputed funds "because title to funds in a wire transfer passes upon acceptance of a payment order." *U.S. v. BCCI Holdings (Luxembourg), S.A.,* 980 F. Supp. 21, 27 (D.D.C. 1997). According to Article 4A, "a funds transfer is complete when the beneficiary's bank accepts the payment order." *Id;* M.C.L. § 440.4604(a). In most cases, acceptance occurs "[w]hen the bank pays the beneficiary[,]" according to M.C.L. § 440.4905, "or notifies the beneficiary of receipt of the order or that the account of the beneficiary has been credited" concerning that order. M.C.L § 440.4709(2)(a).

Under § 4905, if the beneficiary bank credits the beneficiary's account with the payment order, "payment of the bank's obligation . . . occurs when . . . the beneficiary is notified of the right to withdraw the credit." *Id.* § 4905(1). Additionally, "[n]otice (and thus knowledge of the

credit on the part of the beneficiary) is not required to effectuate payment . . . if the funds otherwise are made available to the beneficiary." *First Sec. Bank of N.M.,* 215 F.3d at 1158.

Furthermore, "an accepted transfer cannot be revoked without the consent of the beneficiary." *BCCI Holdings,* 980 F. Supp. at 27 (citing *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 901-02 (2nd Cir. 1987)). The beneficiary bank is obligated to pay the beneficiary after accepting the payment order. *Id;* M.C.L. § 440.4904(1). Thus, "the ownership interest in those funds must pass from the originator" after the funds transfer is completed. *Id.*

Greis and Olympia acknowledge that on July 29, 2011, Ritz informed Greis that the disputed funds were to be wired that day. On that same day, Olympia ordered Regions Bank to wire funds to First Place. After Ritz informed Greis that the funds had been wired, Greis confirmed receipt of the funds with First Place, which sent a response to Greis acknowledging that the funds transfer was complete. Not only was Greis' account credited with the wired funds, but notification of receipt of the funds was accomplished as well. Therefore, on July 29, 2011, First Place accepted the funds and ownership of those funds vested in Greis.

### *iii. No Exception Under The UCC Disentitles Greis To The Wired Funds*

But, "there are important exceptions to the rules regarding acceptance under" Article 4A. *BCCI Holdings,* 980 F. Supp. at 27. Olympia cites to an exception under M.C.L. § 440.4707(2):

(1) . . .

(2) If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:

(a) Except as otherwise provided in subsection (3), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.

10

(b) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

It is not clear that § 4707(2) applies here, since "Greis JEW, Inc" and "Greis Jewelers, Inc.," do not identify different persons; one is just an abbreviated version of the correct name. However, a second condition must be met: Knowledge. The beneficiary bank must have knowledge of the conflict before acceptance under the UCC can be nullified. "'Knowledge' means actual knowledge, not constructive knowledge, and is determined at the time of payment." *First Sec. Bank of N.M.,* 215 F.3d at 1153 (citing UCC 4A-207 (M.C.L. §440.4707), Official Comment 2).

If the beneficiary's bank "did not know about the conflict between the name and number," then acceptance was proper. M.C.L. § 440.4707, Official Comment 2. The reason is that the beneficiary's bank "has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary." *Id.* "Thus, the drafters of [§ 4707] clarified that although it is possible for the beneficiary's bank to determine whether the name and number refer to the same person," the beneficiary's bank has no affirmative duty to clarify a conflict. *First Sec. Bank of N.M.,* 215 F.3d at 1152. Finally, "the statute 'is not limited to cases in which processing is done by automated means . . . [a] bank that processes by semi-automated means or even manually may rely on" the account number. *Id.* (citing 4A-207 (M.C.L. § 440.4707), Official Comment 2).

Although First Place and Olympia genuinely disagree as to whether "Greis JEW, Inc," and "Greis Jewelers, Inc." refer to "different persons," that disagreement is immaterial. Two requirements must be met for the exception to apply: (1) the name and the account number must identify different persons; and (2) the beneficiary bank, or First Place, must have had actual

11

knowledge of the conflict at the time it credited Greis's account. Olympia's argument focuses on the difference between the names; it does not adequately address whether First Place had actual knowledge.

Olympia argues that based on the longtime bank-customer relationship between First Place and Greis, the Court should presume that First Place should have known that the two names were different. However, it could also be argued that the long term relationship may have given First Place all the more reason to know "Greis JEW Inc" and "Greis Jeweler, Inc." were, indeed, the same person. But, constructive knowledge is not the standard. Olympia must allege sufficient facts to create a genuine issue of material fact that First Place had actual knowledge at the time it credited Greis's account, that there was a conflict between the beneficiary's name and the account number. There are no facts presented which support a finding that First Place had actual knowledge of any conflict. Moreover, there was not a complete disconnect between the account name and the account number. The designated name and account number bore a sufficient resemblance to one another such that the exception in § 4707(2) is not triggered.

Because Olympia cannot meet the requirements under § 4707(2), the exception does not apply. Acceptance was proper and Greis is entitled to the wired funds.

The Court must now consider the parties' arguments regarding Olympia's cross claim.

### D.  Olympia Is Estopped From Asserting Any Equitable Claim For Relief

Olympia makes two arguments why First Place should be equitably estopped from collecting the wired funds: unjust enrichment and mistaken payment. Those arguments fail.

### i. Olympia's Unjust Enrichment Claim Fails

Michigan "has long recognized" the right to recovery "when a person has been unjustly enriched at the expense of another." *Mich. Educ. Employees Mut. Ins. Co. v. Morris,* 596 N.W.2d

12

142, 151 (Mich. 1999). The right to recover for unjust enrichment "'exists whenever a person . . . has in his or its possession money which in equity and good conscience belongs'" to another. *Id.* at 151 (quoting *Hoyt v. Paw Paw Grape Juice Co.,* 123 N.W. 529, 531 (Mich. 1909) (emphasis omitted)). Unjust enrichment encompasses two elements: (1) the receiving party must have obtained a benefit; and (2) it is inequitable for the receiving party to keep that benefit. *Id.* The party claiming unjust enrichment has the burden to prove these elements. *Id.*

However, "[i]f the recipient of such a benefit has relied to his detriment on" the benefit received, the party claiming unjust enrichment will "be estopped from demanding reimbursement." *Id.* (citing *Leute v. Bird,* 268 N.W. 799 (Mich. 1936)).

The benefit here is the deposit of the wired funds into Greis's account. According to the Tenth Circuit, "a bank that makes wire funds available simultaneously with an account credit bestows an immediate benefit upon the beneficiary, regardless of any subsequent notice to the beneficiary of the credit." *First Sec. Bank of N.M.,* 215 F.3d at 1157.

On July 29, 2011, Greis confirmed receipt of $47,000.00 wired to its bank account from Olympia. When the wired funds were credited to Greis's account, it had received a benefit from Olympia. On the same day, Greis shipped the Audemars Piguet watch to Ritz and settled the consignment agreement it had with a third-party for the sale of the watch in the amount of $35.000.00. Also, between July 29, 2011, and August 3, 2011, Greis, using parts bought from a vendor, as well as its own inventory, constructed a ladies' watch for Ritz which cost roughly $5,000.00. On August 3, 2011, Greis shipped that watch to Ritz. It was the next day, August 4, 2011, that both First Place and Greis learned that the $47,000.00 wired to Greis's account was a mistake due to the fraudulent scheme set in motion by Ritz. However, Greis had already changed its position to the tune of over $40,000.00.

13

Olympia knows all of this. Nonetheless, it simply argues in conclusory fashion that it would be inequitable to allow Greis to retain the funds. Michigan law is clear that such an argument fails when the mistaken payee relies on a mistaken payment to its detriment. Greis is not at fault; fault lies with Ritz who knowingly defrauded Olympia. Moreover, even though Olympia's negligence would not defeat an equitable claim, Olympia is at fault as well.

Olympia wired tens-of-thousands of dollars to a virtually unknown party for a car it found online. Olympia did no legitimate research to confirm Ritz owned the car. Also, a subsequent search easily revealed that Ritz was not the owner. Unfortunately for Olympia, its diligence was exercised six days after the wire transfer was completed, and a day after Greis shipped the final watch to Ritz.

Because Greis relied on the wire transfer to its detriment, Olympia loses on its unjust enrichment claim.  At oral argument held on March 18, 2013, Olympia argued that First Place cannot win based on detrimental reliance since Greis didn't rely on anything Olympia told it to change its position; Olympia says Greis relied on First Place's representation that funds were available in its account to spend.

This argument misses the mark.  First Place now stands in Greis's shoes and has the right to assert detrimental reliance in response to Olympia's unjust enrichment cross-claim.  And, as already stated, the benefit that Greis relied on was the deposit to its account, not anything First Place represented to it.

### ii. Olympia's Mistaken Payment Claim Fails

In Michigan, "'[i]t is well-settled law that a payment, although voluntarily made, if made under a mistake of a material fact, may be recovered, even if the mistake be due to lack of investigation.'" *Montgomery Ward & Co v. Williams,* 47 N.W.2d 607, 611-12 (Mich. 1951)

14

(quoting *Couper v. Met. Life. Ins. Co.,* 230 N.W. 929, 931 (Mich. 1930)). "'Payments made by reason of a mistake or ignorance of a material fact are regarded as involuntarily made.'" *Wilson v. Newman,* 617 N.W.2d 318, 321 (Mich. 2000) (quoting *Pingree v. Mutual Gas Co.,* 65 N.W. 6, 8 (Mich. 1895)). Furthermore, that rule applies even when "'there was negligence on the part of the person making the payment[.]'" *Id.* (quoting *Walker v. Conant,* 31 N.W. 786, 787 (Mich. 1887)).

However, the law regarding mistaken payments is the same as it is for unjust enrichment: recovery is precluded if the party who received the mistaken payment "can demonstrate a change of position or detrimental reliance as a consequence of having received the mistaken payment . . . ." *Id.* at 322.

The Court has already discussed Greis's detrimental reliance. Olympia is barred from recovery on its mistaken payment claim.

### E.  Olympia's Additional Equitable Arguments Fail

Olympia claims that Greis' reliance on the mistaken wire transfer fails because the reliance was unreasonable. This argument fails as well.

Olympia cites no authority, let alone facts to support its assertion. Olympia claims that because the vehicle's VIN-number was attached to the wire transfer form, Greis should have known something was afoot and should have taken steps to clarify what was going on. However, Greis confirmed receipt of the funds with First Place by telephone and never received a copy of the wire transfer form. First Place accepted the funds and credited Greis's account. With this knowledge, Greis used the $47,000.00. When Greis did this, it had no knowledge the wire transfer was fraudulent. In fact, the first time anyone at Greis saw the form was during a deposition after this action was filed.

15

Olympia cites *Tkachik v. Mandeville* to support its request that the Court fashion an unspecified equitable remedy which would reimburse Olympia. According to *Tkachik,* "[i]n its sound discretion, [a] Court may grant equitable relief '[w]here a legal remedy is not available[.]'" *Tkachik,* 790 N.W.2d 260, 265 (Mich. 2010) (quoting *Powers v. Fisher,* 272 N.W. 737 (Mich. 1937)). The Court has discussed — and declines to provide Olympia with — equitable relief under the most common themes, and Olympia offers the Court no guidance on, or basis for, other equitable relief. To grant relief in favor of Olympia would supplant Michigan's longstanding law on equitable relief and place the certainty of payments made in conformity with the UCC in jeopardy.

Additionally, at oral argument, counsel for First Place offered proof that Greis filed an insurance claim — which was denied — on the watches shipped to Ritz prior to settling its counter-claim with First Place. Thus, the Court is satisfied that Greis will not be doubly enriched.

Therefore, Olympia's additional arguments for equitable relief are denied.

## IV. CONCLUSION

First Place's motion for summary judgment on the interpleader and Olympia's cross-claim are **GRANTED.** Olympia's cross-motion for summary judgment is **DENIED.** Judgment will enter in favor of First Place Bank.

**IT IS ORDERED.**


 _/s/ Victoria A. Roberts_____
Victoria A. Roberts
United States District Judge

Dated:  3/18/13

16

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 18, 2013March 18, 2013.

S/Linda Vertriest
Deputy Clerk